David L. Mortensen (#8242)
   Email: dmortensen@foley.com
FOLEY & LARDNER LLP
299 South Main Street, Suite 2000
Salt Lake City, UT 84111
Telephone: 801.401.8921

*Attorneys for Snap One, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| SNAP ONE, LLC, a North Carolina limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>AM RUDDEN INC., a Florida Corporation, AARON M. RUDDEN, an individual, and CARIBBEAN ENTERTAINMENT TECHNOLOGIES, LTD., a Trinidad and Tobago limited liability company,<br><br>    Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No.<br><br>The Honorable |

Plaintiff Snap One, LLC hereby complains, petitions, and alleges as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Snap One, LLC ("Snap One") is a North Carolina limited liability company with its co-headquarters and principal place of business in Draper, Utah.

2. Defendant AM Rudden Inc. ("AMR") is a Florida corporation with its principal place of business in Medley, Florida.

3. Defendant Aaron M. Rudden ("Rudden") is an individual who, on information and belief, resides in Florida.

4.     Defendant Caribbean Entertainment Technologies, Ltd. ("CET") is a Trinidad and Tobago limited liability company, with its principal place of business in Barataria, Trinidad and Tobago.

5.     Rudden is the sole member of CET and, on information and belief, is the owner of AMR.

6.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331(a) because Defendants' conduct violates the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Court has supplemental jurisdiction over Snap One's state law claims pursuant to 28 U.S.C. § 1367.

7.     The Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The parties are diverse and the amount in controversy exceeds $75,000.

8.     This Court has personal jurisdiction over Defendants pursuant to Utah Code § 78B-3-205 because Defendants have transacted business within the State of Utah and caused injury within the State of Utah. This dispute arises from Defendants' contacts with this District, and Defendants have purposefully availed themselves of the Utah forum such that they could reasonably anticipate being called to defend themselves in courts within the state. Requiring Defendants to litigate this case in this Court does not offend traditional notions of fair play and substantial justice and is permitted by the Due Process Clause of the United States Constitution.

9.     Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District. Venue is also proper in this Court pursuant to a valid forum selection clause in the Authorized Dealer Agreement between Snap One and AMR. *See* Authorized Dealer Agreement at §13.5.

**FACTUAL ALLEGATIONS**

**Snap One's Business and Relationship with Authorized Dealers**

10. Snap One is in the business of designing, manufacturing, and distributing a complete product portfolio of custom smart-home, control, and automation solutions for residential and commercial homes and buildings.

11. Snap One's product line includes its Control4 line of controllers and associated web and mobile applications, which it sells only through authorized dealers and smart home integrators that sign Authorized Dealer Agreements.

12. Snap One is the successor-in-interest to Control4 Corporation.

13. In 2019, Utah-based Control4 merged with North Carolina-based Wirepath Home Systems, LLC, dba SnapAV ("Wirepath"). Shortly thereafter and pursuant to an Assignment and Assumption Agreement, all of Control4's assets and liabilities, including its dealer agreements, were assigned to Wirepath.

14. In 2021, Wirepath changed its name to Snap One. Snap One continues to use the name "Control4" as a "dba" and a brand to sell Control4-branded products to authorized dealers.[1]

15. Control4 branded products are connected devices that are used by end consumers in homes and businesses as part of a whole home control, automation, and media distribution system. A Control4 controller is central to each Control4 system, and allows users to control and manage their various internet connected devices through the Control4 web or mobile application, as well as from other in-home devices such as touch screens and remote controls. A typical

---

[1] For convenience, the entities of Control4, WirePath, and Snap One are referred to collectively as "Snap One."

3

Control4 system is connected to multiple other devices or products, such as door locks, lights, speakers, intercoms, garage door openers, touch screens, audiovisual distribution equipment, network systems, power systems, and HVAC systems. As a result, the end-user can control and use all of those products through the Control4 application, without the need to login in and use multiple apps to connect to and control all of their various smart devices. Control4-branded products interoperate with thousands of third-party products.

16. Due, in part, to the complexity of designing and programming the Control4 and third-party products and ensuring the Control4 devices are integrated properly with other "smart" products, end users are required to have a Control4 authorized dealer install and service a Control4 system. The dealer installs and programs the system and, thereafter, provides ongoing support and maintenance. Programming may be completed on-site, or also, when authorized by the end user, remotely using Control4's proprietary programming and maintenance utility software called Composer Pro (the "Control4 Software").

17. When an end-user engages a Control4 authorized dealer to program and service their Control4 system, they often provide their dealers authorization to program and manage their devices remotely through the Control4 Software.

18. Accordingly, Snap One maintains stringent requirements for its authorized dealer program to protect its end users, its brand, and its reputation. Dealers that want to sell and service Control4 products and use the Control4 Software, therefore, are required to complete a rigorous vetting process, a certification program, receive ongoing training, and operate under the terms of Authorized Dealer Agreements.

19. Snap One also limits access to the Control4 Software through license agreements and strict limits on authorized dealer access. Snap One also prohibits its authorized dealers from providing access to the Control4 Software to any unauthorized individual or entity.

20. In addition to its Authorized Dealer Agreement, authorized dealers must comply with Snap One's Remote Monitoring Software License Agreement and Terms of Use for Authorized Dealers and Installers (the "Terms of Use").  The Terms of Use prohibit authorized dealers from distributing, sublicensing, or sharing the Control4 Software, and mandate that authorized dealers treat username, password, and any other registration details needed to access the Control4 Software as confidential. An authorized dealer is prohibited from disclosing this information to any other person or entity or allowing any other person or entity to use the information to access the Control4 Software.

21. Violations of Control4's Authorized Dealer Agreement and Terms of Use can cause significant monetary and reputational damages to Snap One.

**The Dealer Agreement Between AMR and Snap One**

22. In 2011, AMR applied for and was accepted as a Control4 authorized dealer to sell Control4 branded products.

23. Upon its acceptance as an authorized dealer, Rudden signed an Authorized Dealer Agreement ("Dealer Agreement") on behalf of AMR. A copy of the Dealer Agreement is attached as Exhibit A.

24. The Dealer Agreement granted AMR a limited license to market and sell Control4 products. It also explicitly prohibited AMR from unauthorized use, disclosure and distribution of Snap One's intellectual property rights and other proprietary rights. And, in the Dealer Agreement, AMR agreed to use commercially reasonable efforts to prevent any unauthorized

copying or distribution of Snap One's intellectual property by AMR, any third party, or their agents. The Dealer Agreement also included protections for other confidential information.

25. AMR operated as an authorized dealer from the time the Dealer Agreement was executed in 2011 until it was terminated on February 5, 2022. During that time, AMR was required to comply with all terms of the Dealer Agreement and the Terms of Use to maintain its license.

26. As an authorized dealer, AMR accessed and used the Control4 Software to support and service its customers with Control4 systems.

**Defendants Represent that AMR and CET Are Affiliated Entities**

27. During this time, Snap One understood that CET was a business name (a "DBA") or, at a minimum, affiliated with and controlled by AMR. Indeed, Snap One believed that CET was either the same entity as or was, at a minimum, acting as a Snap One dealer through AMR as an affiliate and was therefore bound by the Dealer Agreement.

28. Indeed, during the life of the Dealer Agreement, Rudden and AMR repeatedly represented that CET was a DBA and that AMR and CET were, at a minimum, affiliates and that CET was operating under AMR's Dealer Agreement.

29. For example, on September 14, 2017, Snap One's regional sales manager, Nicholas Rosado ("Rosado"), agreed to attend a trade show with AMR. In preparation for that show, AMR representatives asked Rosado to deliver demo kits to "our MIA address," which he listed as "CARIBBEAN ENTERTAINMENT TECHNOLOGY LTD, 1700 Banks Rd, Suite #70, SKY 14173 CET, Margate, Florida 33063."

4869-2788-5584.1

30. Similarly, in a credit application submitted to Snap One, AMR listed CET as a DBA used in its operations and submitted CET's financial statements as support for a line of credit from Snap One to AMR. A copy of the credit application is attached as Exhibit B.

31. Snap One relied on these and other representations and, in doing so, worked with Rudden and AMR/CET on a business opportunity with Telecommunications Services of Trinidad and Tobago ("TSTT").

**The TSTT Deal**

32. TSTT is the state-owned telecommunications company in Trinidad and Tobago, whose services include providing home-security systems for its subscribers.

33. Snap One is informed and believes that, in or about 2020, TSTT stated that it was interested in upgrading TSTT's alarms systems for its existing subscribers to alarm systems manufactured and serviced by Clare Controls, LLC ("Clare").

34. Snap One is the exclusive worldwide distributor of Clare products.

35. After learning of TSTT's interest in upgrading its alarm systems, Rudden contacted Snap One about supplying Clare products and services to TSTT (the "TSTT Deal").

36. As part of the TSTT Deal, on or about February 20, 2020, Rudden asked Rosado to provide a letter stating that CET was Snap One's only authorized dealer for government telecommunications in Trinidad and Tobago. At that time, AMR was Snap One's only authorized dealer qualified for government telecommunications sales in Trinidad and Tobago. Accordingly, relying on AMR's representations and conduct demonstrating that AMR and CET were one and the same, Snap One agreed to send a letter stating that CET was, at that time, "currently the exclusive Control4 dealer for government telecommunications sales and service in Trinidad and Tobago." In agreeing to issue this letter, Snap One repeatedly told Rudden that the

7

letter meant only that CET was "currently" the exclusive dealer qualified for government telecommunication sales and service in Trinidad at that time because it was the only dealer qualified as such at that time, but that this would not prohibit Snap One from onboarding additional dealers to sell to the Trinidad government.

37. Based on Rudden's repeated agreement to the limitations explained above, Rosado sent Rudden two documents in response to his requests. Each of those documents referenced the Dealer Agreement or Snap One's internal partner ID number for AMR – AMR900 -- which was associated with the Dealer Agreement. The first document was titled "Dealer Exclusivity Letter -AMR900" and stated that CET was "currently the exclusive Control4 dealer for government telecommunications sales and service in Trinidad and Tobago." The second document was a draft amendment to the AMR Dealer Agreement that allowed AMR to sell Clare products in the Caribbean.

38. Snap One, AMR/CET, and TSTT continued to discuss terms for the TSTT Deal throughout 2020.

39. In connection with the TSTT Deal, Defendants continued to represent that AMR and CET were affiliates and that CET was operating as a Snap One Dealer through AMR. For example:

    a. On August 9, 2020, Rudden represented to Snap One through an email attachment that "CET is the [T]rinidad company supplying TSTT, AMR is a sister company in [M]iami supporting CET with logistics and distribution." In that same email, Rudden categorized his associates involved in the TSTT Deal as employees of "CET/AMR," and listed his title as the "CEO Group" for "CET/AMR".

8

  b. On or around February 8, 2021, AMR submitted a credit application to Snap One seeking a $1 million line of credit related to the TSTT Deal. The credit application stated that the legal business name was "A.M. Rudden Inc." and listed two DBAs: "CET Limited" and "AMR Limited." AMR's credit application was signed by CET's Chief Financial Officer, Prashant Patasar. And Patasar attached CET's financial statements as support for AMR's line of credit application.

  c. On April 6, 2021, Rudden represented to Snap One that he required an updated letter of exclusivity for the TSTT Deal. Based on Snap One's continued understanding that CET was a DBA or, at a minimum, an affiliate of, controlled by and acting under AMR, Snap One issued a second letter of exclusivity, again referencing AMR in the title of the document. In sending this letter, Snap One again made clear to Rudden that this would not prohibit Snap One from onboarding additional dealers, as Snap One does not award perpetual exclusivity rights to dealers.

  d. On April 29, 2021, Rudden represented to TSTT and Mr. Rosado in an email that "AMR is the distributor of Clare products to the Caribbean area so all transactions go thru [sic] that company, CET is the dealer for Clair [sic] products under AMR/Snap AV for this project, as directed to AMR by Clare."

40. On October 1, 2020, during the negotiations related to the TSTT deal, Rudden introduced the Snap One team over email to an additional vendor called MSpace, stating that AMR/CET had "partnered with this company to assist with Logistics, roll out and so forth." Prior to Rudden's introduction, Snap One did not have a commercial relationship with MSpace.

41. On May 18, 2021, AMR/CET backed out of the TSTT Deal. Specifically, AMR/CET informed Snap One and TSTT that AMR/CET would not be able to perform on the

9

deal and encouraged MSpace to proceed in AMR/CET's place. Indeed, Rudden stated: "We welcome Mspace to proceed with TSTT exclusively. . . . Should MSpace desire to proceed as lead on this project, CET will provide (with support from Clare Controls) all reasonable support and assurances . . . for Mspace to confidently proceed for product and services supply."

42. On or around that same day on May 18, 2021, Rudden participated in a telephone call with representatives of AMR/CET, MSpace, TSTT and Snap One. During that call, Rudden stated that "[a]fter chatting with MSpace and so on, CET is not in a position to take lead on the project, there's just relevant parties, finance and so forth that are, I guess, among other things, the whole Covid state of emergency hasn't improved financial confidence, but chatting with [MSpace] they seem to have financing in place . . . with that in mind, CET would bow out and let MSpace take lead and we will support MSpace as needed. If MSpace wants to proceed as lead, we will provide all the reasonable support and assurances. . . . And you know, help MSpace get the job done. I'm sure the manufacturer will support us in that. . . . Obviously if I engage as lead in a contract without financing in place and without the ability to proceed in that, I would immediately be in breach." On the same call, TSTT accepted Rudden's repudiation.

43. As a result of AMR/CET's repudiation, and the limited time to select a new dealer to conduct the deal, MSpace applied for and became an authorized dealer to perform under the TSTT Deal.

44. Despite its repudiation, CET has sued Snap One in the U.S. District Court for the Southern District of Florida for breach of contract and various other claims related to the TSTT Deal ("Florida Lawsuit").

**Rudden and AMR Give CET and Others Unauthorized Access to the Control4 Software**

45. As alleged above, during the life of the Dealer Agreement, Defendants repeatedly represented that CET was an AMR DBA, that AMR and CET were affiliated entities, and that CET was operating under AMR's dealer agreement. CET also represented itself as a Snap One dealer to customers.

46. During that time, CET accessed the Control4 Software (access to which is strictly limited to Snap One authorized dealers) to service customer accounts. Snap One understands that Rudden and/or AMR gave CET access to the Control4 Software to access and manage sensitive end-user Control4 systems.

47. Recently, however, in connection with the Florida Lawsuit, Rudden represented to Snap One that CET and AMR are not affiliated entities. Rudden further claimed that CET was not operating under or bound by the Dealer Agreement. Indeed, in a sworn declaration, Rudden stated that AMR and CET are "distinct entities that are operated separately."

48. If CET was not operating under and bound by the Dealer Agreement, as it now claims, CET was not authorized to (a) sell and service Control4-branded products, (b) access the Control4 Software, (c) access end user Control4 systems, or (d) represent itself as a Snap One dealer to customers and the public. And neither AMR nor Rudden was authorized to give CET the information necessary to access the Control4 Software.

49. As a result, Snap One was required to terminate AMR as a Control4 dealer. Moreover, it must now work to transition AMR's existing Control4 customers to new Control4 dealers, which typically causes significant time and monetary costs to Snap One, in addition to

4869-2788-5584.1

the significant reputational costs associated with informing impacted customers that AMR allowed unauthorized access to their systems.

50. Snap One also recently learned that Defendants provided access to the Control4 Software to unauthorized third parties, including Jeffrey Hagg, his employees, and at least one entity managed by Mr. Hagg.

51. Snap One is informed and believes that Jeff Hagg or his associated employees and entities have engaged in fraudulent activities against Snap One's customers, including selling unauthorized remote programming services that were then not performed after Mr. Hagg was paid.

52. Snap One has conducted a cyberforensic investigation into its system records. Based on this investigation, Snap One has reason to believe that Mr. Hagg and his associated employees and entities used the access to the Control4 Software improperly provided by Rudden.

**FIRST CLAIM FOR RELIEF**
(Breach of Contract Against AMR)

53. Snap One incorporates by reference the allegations set forth in the preceding paragraphs as though set forth fully herein.

54. The Dealer Agreement and the Terms of Use are valid and enforceable contracts between Snap One and AMR.

55. Snap One fully performed its obligations under the Dealer Agreement by acting in accordance with the terms set forth therein.

56. AMR materially breached the Dealer Agreement and Terms of Use in at least the following ways:

    a. Disclosing confidential information, as defined by § 7 of the Dealer Agreement, to third parties and their agents;

      b.      Exceeding the scope of AMR's limited license;

      c.      Failing to comply with all Snap One's dealer policies, including by violating the Terms of Use and engaging in sub-distribution of access to the Control4 Software;

      d.      Allowing third parties to access the Control4 Software; and

      e.      Making material misrepresentations to Control4.

57.      As a direct and proximate result of AMR's breaches of the Dealer Agreement, Snap One has suffered, and continues to suffer, damages in an amount to be determined at trial but not less than the jurisdictional amount.

**SECOND CLAIM FOR RELIEF**
(Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030) Against All Defendants)

58.      Snap One incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

59.      Defendants knowingly and intentionally accessed, and conspired to access, Snap One's Control4 Software without authorization.

60.      Additionally, Defendants knowingly and intentionally accessed, and conspired to access, Snap One's Control4 Software in a manner that exceeded their authorization.

61.      Defendants also improperly allowed third parties to access Snap One's Control4 Software.

62.      Snap One's Control4 Software, which was used and accessed by Defendants and/or persons acting under Defendants' direction, qualifies as a "protected computer[]" under the CFAA, 18 U.S.C. § 1030(e)(2)(B), because it is used in or affects interstate or foreign commerce or communication and because authorized dealers routinely access Snap One's

4869-2788-5584.1

Control4 Software and associated servers and other supporting computing infrastructure from outside Utah.

63. When Defendants accessed Snap One's Control4 Software, they obtained or altered information in the computers that they were not entitled or authorized to obtain or alter. Specifically, Defendants obtained end users' information and data, including but not limited to names, customer numbers, location data, IP addresses, and email addresses (collectively, "Personal Data").

64. Defendants' access of Snap One's Control4 Software as alleged herein caused damage to Snap One within the meaning of 18 U.S.C. § 1030, in excess of $5,000.

65. Defendants' access of the Control4 Software allowed them to obtain Personal Data and to remotely access, monitor, and alter end users' smart home systems and connected devices. By facilitating unauthorized access of Snap One's Control4 Software, Defendants caused a threat to public safety within the meaning of 18 U.S.C. § 1030.

66. Defendants' access of Snap One's Control4 Software as alleged herein caused damage, within the meaning of 18 U.S.C. § 1030, affecting 10 or more computers and computer systems during a one-year period.

67. The damages that Snap One has incurred include, but are not limited to, impairment of the integrity of the information and Personal Data that Defendants obtained when they accessed Snap One's Control4 Software without authorization or exceeding authorization.

68. Additionally, Defendants gave improper access to Snap One's Control4 Software to Jeff Hagg and associated employees and entities, causing Snap One significant damages, including the loss of good will and reputational damages.

4869-2788-5584.1

69. Snap One's losses also include, but are not limited to, the costs Snap One incurred and will incur in responding to Defendants' actions and conducting a damage assessment, which losses are ongoing at this time.

**THIRD CLAIM FOR RELIEF**
(Fraudulent Misrepresentation Against All Defendants)

70. Snap One incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

71. As set forth above, Defendants repeatedly represented to Snap One that CET was DBA or an affiliate of AMR.

72. Defendants' representations were material, and Snap One relied on those representations in that it would not have allowed CET to access the Control4 Software without them. Additionally, Snap One would not have facilitated the TSTT Deal with CET as an unauthorized dealer.

73. According to Rudden's recent claims in connection with the Florida Lawsuit, Defendants' representations regarding the affiliation of AMR and CET were false. Indeed, Rudden now asserts that AMR and CET are distinct entities that are operated separately and that CET was not bound by the Dealer Agreement.

74. To the extent Defendants' representations regarding the affiliation of AMR and CET were false, AMR and Rudden knew the representations were false at the time they were made.

75. Defendants made the representations for the purpose of inducing Snap One to (1) allow CET to access the Control4 Software and market and sell Snap One's Control4 products without entering an authorized dealer agreement, (2) support the TSTT Deal even though CET

15

was not an authorized dealer, and (3) give AMR a line of credit of up to $1,000,000 based on an unaffiliated entity's financial statements.

76. Snap One relied on these representations and allowed CET to access the Control4 Software and Snap One's sales channels.

77. Snap One further relied on these representations when it facilitated the TSTT Deal with CET.

78. As a direct and proximate result of Defendants' fraudulent misrepresentations, Snap One has suffered and will continue to suffer damages in an amount to be proven at trial.

## JURY DEMAND

Snap One demands a jury trial on all issues triable by right of jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Snap One prays for judgment against Defendants as follows:

A. On the First Cause of Action:

    1. For general compensatory damages in an amount to be determined at trial.

B. On the Second Cause of Action:

    1. For general compensatory and statutory damages in an amount to be determined at trial.

C. On the Third Cause of Action:

    1. For general compensatory and punitive damages in an amount to be determined at trial.

D. On All Causes of Action:

    1. For an award of attorneys' fees and costs pursuant to the Dealer Agreement or as allowed by applicable law;

2.      For pre- and post-judgment interest as allowed by applicable law;

3.      For such other and further relief as this Court may deem appropriate under the circumstances.

DATED: February 23, 2022

FOLEY & LARDNER LLP

*/s/ David L. Mortensen*
David L. Mortensen

*Attorneys Snap One LLC*

<u>Snap One, LLC</u>
11734 South Election Road, Suite 200
Draper, UT 84020